Gentlemen, this is the time for your argument in the United States v. Marin Alliance, and we understand all who intend to present argument are here, and those counsel who intend to divide argument have reached an agreement on how it is to be divided, and so we will proceed to hear the matter. Good morning, Your Honors, and may it please the Court. My name is Randy Barnett. I represent the Oakland Cannabis Buyers Cooperative, and I am also speaking this morning on behalf of Appellants Ukiah and Marin. Mr. Gerald Ullman will speak on behalf of the Women's Alliance for Medical Marijuana. There are many lawyers in the courtroom this morning and many clients in the courtroom this morning. I can't acknowledge all of them, but I do want to acknowledge the presence of Mr. Taylor Carey, representing the amicus State of California, who was in the courtroom this morning. Your Honors, I will take 17 minutes to address the Commerce Clause and state sovereignty issues raised by this case. Mr. Ullman will take eight minutes to address the issues of fundamental rights and the immunities theory raised in this case, and we are both prepared to answer questions on the importance to this case of the Supreme Court decision in Lawrence v. Texas, and we will then reserve five minutes for rebuttal. We have identified in our briefs three basic constitutional objections to the injunction in this case, and the Lawrence case raises a fourth constitutional objection, and the four all together are, first, because the injunction in this case exceeds the powers of Congress under the Commerce Clause. Second, it is outside the implied powers of Congress under the Necessary and Proper Clause because it interferes with the police powers of the State of California. Third, because as in Lawrence, this injunction infringes on the personal liberties of the appellants that are not harmful to others without adequate justification. And finally, and this is the issue to be addressed by Mr. Ullman, because it violates the fundamental rights of the appellants. Now there are two issues that I think have been muddied by the pleadings in this case that I want to be sure that I get to and pay special attention to. The first is the definition of the relevant class for purposes of aggregation. The second is the issue of the Supremacy Clause for purposes of the police powers argument that we've been making in this case. The government has urged upon you an approach to identifying the relevant class for purposes of identification that cannot be tenable. We are compelled to identify the relevant class of activities here for purposes of aggregating the effects of that class to see if it has a substantial effect on interstate commerce. We are not compelled to do so by our theories. We are compelled to do so by the case of Wickard v. Filburn, which established the aggregates effects principle. If we were writing on a blank slate and we didn't have Wickard v. Filburn, we could stop simply by saying that the government has exceeded its powers under the Commerce Clause because it has gone beyond interstate commerce. But Wickard allows the government to go into intrastate commerce under certain defined circumstances, and that is when the class of conduct at issue is shown to have a substantial effect on interstate commerce. So the question is how do you define that class? And there are two basic approaches that can't possibly be right. The first approach would be to limit the class or to gerrymander the class so narrowly that it basically fits the individual party, him or herself alone. That would be the kind of de minimis approach that is ruled out by case law and would essentially undermine the whole point of Wickard, which is to allow the aggregation of similar activities to see what kind of effect it has on interstate commerce. So that can't be right. On the other extreme is the government's position that any class, that the class must be identified by Congress, and whatever class happens to be identified by Congress under the statute as the class at which it is aimed, that is the only class that the court is free to identify as the relevant class. That can't be right. And the reason why that can't be right is because if that were true, the larger the category of wholly intrastate activities that the government was seeking to regulate, the greater would be its justification for regulating those activities because obviously the larger the aggregate effects of that class would be. That would essentially undermine the limited enumerated power scheme that Wickard is attempting to honor. Didn't we already, excuse me Mr. Barnett, but didn't we already hold in TICER that Congress does have the authority to regulate the purely intrastate distribution of marijuana? You did, and we don't really dispute that as a general proposition. As in a facial challenge to this statute, we do not contest that this statute is constitutional, and also constitutional with respect to some intrastate activities. But the relevant class in this case, Your Honor, is medical cannabis, and that was not addressed by TICER, nor by any other previous But if no, it's addressed by Congress. Congress says that maybe they're wrong, but Congress says there is no permissible use of marijuana, and that's why it's on Schedule I. Well, the statute does speak in general terms, but the findings of Congress that relate to what class of activities this statute is aimed at did not separate out the medical use of cannabis. But that's the significance of putting it on Schedule I. Schedule I means there is no permissible, there is no legitimate medical use, isn't it? Well, yes, but the question is, is the restriction that is contained on Schedule I constitutional as applied to this particular class of activities? It seems to me you're arguing that it's erroneous rather than unconstitutional. I mean, maybe they're wrong about whether it ought to be on I. If they sought to reach this class of activities, which I take from the assumption of your question is that they did seek to reach these activities, the statute doesn't say specifically that they do, but assuming that they did seek to reach these activities, this would be beyond their powers to reach these activities is our argument for the four reasons that I've identified. It's beyond their commerce power, which is the authorizing part of the Constitution under which the Controlled Substance Act is passed to reach this particular class of activities. Would they go for heroin, too? That would go, that would, all use of heroin, Your Honor, or, well, all use of heroin would be subject to all the other cases that we've had with respect to trafficking and possession. A lot has to do with the possession, what the purpose of the possession is, and in this case the class and the purpose of that class has been defined by the State of California as well as by other states. So if we were ever faced with a case in which one state or several states had identified a particular class of conduct or particular use of heroin, for example, for medical purposes, we would then be faced with the same argument. You're kind of losing me here because I thought we were, I thought that the question here arose under federal law, so. It does. But the question is what this is. What is the class that has been defined in California that is consistent with the federal statutes can't be reached under the Commerce Clause? The question is between the two extremes of the individual user and whatever class Congress seeks to reach, the question is how do you decide what the appropriate relevant class is for determining whether it is within or without Congress's commerce power to reach. And in previous cases, for example, in Wickard v. Filburn, where the class of activities that Congress purported to reach was all sale of wheat, the Supreme Court chose to analyze homegrown intrastate wheat as the relevant class that it had then to determine whether the aggregate effects had a substantial effect on interstate commerce. And similarly in the McCoy case, the statute in McCoy attempted to reach all kinds of conduct, but the Ninth Circuit in that case had to identify the relevant class that was under consideration to see whether that was beyond the powers of Congress to reach. The obvious relevant class here is the medical use of cannabis, whether or not the state of California has authorized it, but the fact Medical? Yes. Because it's medical. Because it's medical and because it is wholly intrastate. The commerce cause doesn't reach medicine? It doesn't. The question is whether it reaches a class of wholly intrastate commerce. And then it only reaches a class of wholly intrastate commerce if that class of wholly intrastate commerce has a substantial effect on interstate commerce. And the class that is at issue here, the class that has been created as a result of a conflict between, in this case, the police power exercise of the state of California, which we, which is not dispositive here, Your Honor, but we think is clearly relevant to identifying what is the salient class, just as the individual possession of child pornography was the relevant class in McCoy and the homegrown wheat to be consumed on your own farm was the relevant class in Wickard. The Constitution doesn't speak of those classes either. This has got to be a judicial determination and the reason why it has to be a judicial determination is because the two extremes are unacceptable. And to handle in the middle has to be a judicial determination of, based on common sense and judicial judgment as to what is the relevant class. Why is homegrown marijuana different from homegrown wheat? Homegrown marijuana is different than home, well, it's different than homegrown wheat because homegrown wheat existed as part of a national market and the court found in Wickard versus Filburn that the use of homegrown wheat would affect the market because it would reduce the, it would reduce the demand for interstate wheat and thereby obstruct the legitimate purpose of Congress to regulate the price of interstate wheat. This doesn't? It doesn't. At least, there's no showing that it does. For at least two reasons. First of all, because it's an extremely small amount that's at issue here. And the second reason, if you found that it would, so we contend that there's no effect on interstate commerce whatsoever in any direction. But if this activity had any effect on the market. But the argument, you know, we've heard that you say extremely small, but what we've heard, what we heard before in this area was that this is extremely urgent and there are many people who very much need this. And we held on that basis that there was an exception for medical necessity. Now you're saying, well, this is so small, it doesn't matter and therefore we should just call this whole thing de minimis? It's a small percentage of the overall trafficking in illegal substances that the Controlled Substances Act seeks to reach. And it's even a small percentage of the overall interstate trafficking of cannabis that the Interstate, that the Controlled Substances Act attempts to reach. But let me get to the second reason why. Even if you were to argue that it is big enough to have some effect on interstate commerce, the only effect it could have would be to reduce demand for interstate marijuana or interstate trafficking in marijuana. If this particular narrow specialized demand could be handled solely through intrastate, it would reduce demand for interstate and thereby it would not conflict with the purposes of the Controlled Substances Act. If it reduced demand, then it would bring down the cost, I suppose, of interstate marijuana. And that might be contrary to the federal drug policy of trying to keep the price up to discourage use. Well, once again, it's conceivable, Your Honor, but whether that would constitute a substantial effect is the decision that this Court has to make. I'm conceding for the sake of argument that if it has any effect at all, it would be to slightly reduce demand for interstate cannabis and thereby facilitate the purposes of the Controlled Substances Act, which is to prohibit that substance. The purpose of the scheme in Whippord v. Filburn was to keep prices up. The purpose here is to end the practice whatsoever. This does not conflict with that purpose. But if it should have any effect at all, Your Honor, we argue that it would not be a substantial effect. And we also argue that we are at least entitled to a hearing. We believe this Court is entitled on the basis of this record to rule that there's no substantial effect. But before ruling that there is a substantial effect, we believe we should have a hearing on the question in which the government is finally forced to explain, which they haven't explained, why this particular class of activity does have a substantial effect and then produce evidence in support of that claim. We haven't had such a hearing here. I do also want to address, Your Honor, if I've satisfied you on this, I do also want to address the issue of the supremacy clause which has been raised by the government in this case. Well, before you do, let me ask you, is there any limit on the authority of the federal government to determine what drugs, medicines, products, food products, similar things regulated by the FDA, any limit under the Commerce Clause of their ability to say that certain products are unsafe and can't be used? I believe the limit is that they cannot reach wholly intrastate, first of all, wholly intrastate non-economic activities that do not have any effect or that they cannot reach wholly intrastate non-economic activities that are disconnected from the national market that's within their power to regulate. And they cannot reach wholly intrastate economic activities unless in the aggregate those economic activities are shown to have a substantial effect. So an unsafe product, they cannot ban if it's purely used in intrastate activities? If it's made and consumed solely within the state. If it's something, for example, somebody makes for themselves, people make things for themselves all the time. The nation's garages are full of devices people have made for themselves. I don't believe that's the sort of thing that's within the power of the federal government to ban. I believe it is within the police power of the states to regulate or prohibit, which is what we have, why we have a federal system. We do have an allegation of responsibilities here. Straight plain, straight out murder is not within the power of the state. I'm not talking about the traditional law enforcement activities. I'm talking about the federal government's power to deal with the problems of safety and health and consumer products. You say that's limited also to the interstate commerce clause. And they cannot regulate products that are purely for intrastate use. Their power to achieve the purposes that your honor has identified is limited by the list of enumerated powers they have and anything that's necessary and proper to facilitate those powers. What's bothering me, you've almost used your 17 minutes, but let me just tell you what's a possession case. And I suppose you could argue, well, if you make a dangerous object that you're using in your backyard or rolling around with your kids, that that can't be reached under the commerce clause. But this statute that we're talking about here, it involves distribution. And isn't that different than the statute involved in McCoy where it was just personal possession? I think if it were distribution to the public, it would be different. Because if it was distribution to the general public, marketing to the general public, it could much more easily be considered to be part of a general economic. Because this is for medical purposes? It's because it's for medical purposes and it's because it's either limited to the individuals themselves who grow this substance for their own use or it's within a club whose membership is restricted very strictly. Because this is not general distribution, it has a much more limited effect and therefore is more completely intrastate. Is the club limited to people who need it for medicinal purposes? Yes. I would also point out, Your Honor, as my co-counsel has just brought to my attention, that the FDA only regulates products in interstate commerce. So the jurisdiction of the FDA itself is consistent with the power that Congress has under the interstate commerce clause. And in fact, all states have their own state FDA versions of that, which would be superfluous when necessary if we could just have one national government to run everything without benefit of the laboratories of experiment that's provided by states to do this or any other sorts of You've just about used your 17 minutes. Yes. I now yield the balance of my time to my co-counsel. Thank you. Your Honors, if a dying cancer patient is able to get through one more day without vomiting and get a decent night's sleep free of pain and spend some quality time with his loved ones because he's using cannabis with his doctor's recommendation, what interest does the federal government have in sending armed agents to his bedside to seize him? We asked that question in the assisted suicide case, didn't we? Said the same thing you're saying. And your argument's very persuasive and still is. Persuaded us what? Unfortunately, there are other people who don't agree with you. Now there's a difference. Now our argument is couched in constitutional terms. That wasn't a constitutional case, assisted suicide? Well, the Oakland cannabis ruling. But the assisted suicide case where we said there was a substantive due process right for dying people in pain to get the assistance of doctors to prescribe medical things to ease the pain. And the Supreme Court did not seem to understand that argument. Well, I think five of the concurring justices were ready to concede that the liberty interest that the patient has to avoid intolerable pain and control his own body is protected by the Constitution. In Glucksburg, the court indicated that the state had an interest in prolonging life, but here those interests are consistent. That is, both the patient and the state's interests are being furthered by the medical use of cannabis. Well, didn't we buy that argument in the Oakland cannabis case? In essence, I'm having real trouble if a dying patient can't use this as a medical necessity because Congress says there is no medical necessity. What you bought and what the Supreme Court ruled on was whether we can recognize this defense under the common law within the bounds of the statute. Now, the Supreme Court has said you can't within the statute, so now we have to address the question whether this right is protected by the Constitution and the government is required to show a compelling interest in order to restrict or limit this right. As Justice Stevens put it in his Glucksburg opinion, avoiding intolerable pain and the indignity of living one's final days incapacitated is certainly at the heart of the liberty to define one's own concept of existence. Now, the government has not offered any compelling justification to seize this medication from the patients. What they have said is, well, the court has already decided that there is no legitimate medical use for this substance. And I want to address that issue because I think it's very important that we distinguish the finding that Congress is making under the Controlled Substances Act by putting marijuana on Schedule I and the right that we're asserting here. The finding made under the Controlled Substances Act is for an entirely different purpose, to determine whether a drug should be generally available by prescription. We're not challenging that. But didn't they say in the finding that there was no legitimate medical use for marijuana? Didn't Congress and the surgeon general? No. No, Your Honor. Congress made a finding that there is no currently accepted medical use for marijuana. There's a difference. That term is really a term of art that's carefully defined, and the definition is in the Alliance for Cannabis Therapeutics case cited in our reply brief in the Oakland Cannabis case. In which they set forth various criteria, and it's clear that a substance can be put on Schedule I, even though for an individual patient it would have therapeutic value, it would have medical use. Heroin is a good example of that. Heroin is on Schedule I. Heroin is morphine. Heroin has medical use. It's used in England for terminally ill patients. But it's put on Schedule I for other reasons than whether an individual patient might benefit from its use. And what we're asserting here --. I thought that morphine was slightly morphed heroin. Are they identical? Essentially they are. Heroin breaks down to morphine in the body shortly after it's ingested. And really the only difference between heroin and morphine is the amount that you have to administer to achieve the same effect. Does Congress have the right to be wrong about this? I mean, that's kind of what bothers me. Well, they've clearly held in the Oakland Cannabis case, yes, they do have the right to be wrong. But we're going to defer to congressional determination of this issue. Which brings us back to what is the difference between current accepted or acceptable medical use and legitimate medical use? The five criteria that are used to determine no currently accepted medical use are that chemistry must be known and reproducible, there must be adequate safety studies, there must be adequate controlled studies proving efficacy, it must be accepted by qualified experts, and the scientific evidence must be widely available. Now, when you look at those five criteria, it is not just a determination that this has no therapeutic value, that this will not help any patient. And when a physician recommends to a particular patient that you're not going to benefit from other conventional medications and I recommend that you use marijuana to control your pain, we have a patient now who has no other resource available. So the government has enacted a total prohibition of any access to this one medication that will give him relief. And we're saying under those circumstances, he has a fundamental constitutional right and the government's got to show some compelling interest in order to restrict or limit that right. So you want us to try it again? Well, you've been invited to try it again, I think, by Justice Thomas's opinion, saying we're not going to rule on the constitutional issues. Clearly, the court is going to address the statutory issues first. They have now construed the Controlled Substances Act in such a way that it directly presents this constitutional dilemma. And this is a dilemma not presented to the court in Glucksburg. This is the one opportunity now where we can confront the court with that precise question of whether Americans have a fundamental constitutional right to relieve their pain. And if the government's going to take away the only substance that will relieve their pain, the government is going to have to show some compelling justification. And there has been no compelling interest asserted in this case. Thank you. Thank you. You have five minutes left. That was very well done as far as timing. May it please the Court. Mark Quinlivan for the United States and all four consolidated appeals. The Controlled Substances Act prohibition on the cultivation and distribution of marijuana was a lawful exercise of congressional authority prior to the passage of the Compassionate Use Act in California, and it remains a lawful exercise of congressional authority following the passage of that act. States have every right to determine for themselves what forms of conduct they wish to criminalize or, in this case, decriminalize. But in doing so, a state has no right to alter or cabin a contrary congressional determination that that very same conduct shall remain criminal for purposes of federal law. Did Congress put insulin on Schedule I? I don't believe insulin is on Schedule I. No, I know, but could they? I know it's not, but could Congress decide we're going to put insulin on Schedule I from now on and keep diabetics from getting insulin? Well, Congress certainly could do that, but under the Controlled Substances Act, there is a procedure under Section 811 whereby either the government itself or any interested party can petition to have that substance rescheduled. And certainly, pursuant to that process, insulin would be rescheduled. And there is also a provision, 21 U.S.C. 877, whereby those judgments are reviewed by the Courts of Appeals. And I would also point out that when the rescheduling determination is made, under the law the DEA is required to send the question to the FDA for a medical and scientific evaluation, and that medical and scientific evaluation is binding on the DEA when it reaches its ultimate determination as to the rescheduling process. So Congress recognized when it passed the Controlled Substances Act that there are going to be changes in scientific and medical knowledge that require some changes in the scheduling and sometimes for drugs to be descheduled altogether. What is the status of rescheduling marijuana from Schedule I to Schedule II or something? My understanding is the most recent petition was denied in 2001 by the Drug Enforcement Administration. We've cited that in our briefs. The then Surgeon General David Satcher, on behalf of the Department of Health and Human Services, recommended that based on the FDA's evaluation of the most recent scientific and medical evidence, marijuana should remain in Schedule I. My understanding is that there has subsequently been a new petition that has been sent to the DEA. I don't know exactly what the status of that new petition is. I would point out that there was an earlier petition, of course, that was for rescheduling marijuana that was denied in 1992, and then that was appealed to the D.C. Circuit, and the D.C. Circuit unanimously upheld that determination in the Alliance for Cannabis Therapeutics case. You just said the state doesn't have any right to cabin something. The question is when we examine whether activities have an effect on interstate commerce, how you describe what activities you're concerned about and whether the state defines it or not, one category you could look at is the noncommercial use of marijuana for medical purposes. Is that something that affects interstate commerce? And that's ultimately a decision for the courts under Morrison. I don't think the court can look at that class of activity. Why not? Because the class of activities that the courts must analyze for commerce clause purposes is the class of activities that's defined by Congress. And I think the Supreme Court's decision— Well, Congress can't just say this class is interstate commerce and you have to look at this class. Certainly not. But this court has repeatedly considered the class of activities that Congress has regulated here in a series of decisions from Rodriguez-Camacho to the most recent Bramble case, and has held— All of which were commercial sales of marijuana for normal commercial purposes. Every one of those cases said that. That's not exactly correct, Your Honor. Respectfully, in the Visman case, the court was confronted with marijuana plants rooted in the soil. And the appellant in that case, of course, argued that you had to look at that particular class of activities because how could marijuana plants rooted in the soil affect interstate commerce? Well, they'd affect it because they were used normally for interstate commerce. They were used, could be sold. Here you have a category that would—unlike plants rooted, which can go anywhere, here you have a carefully limited, regulated category of marijuana used solely for medical purposes. Well, I would have to— What's wrong with looking at that category? I would have two answers, Your Honor. First off, in Oakland Cannabis, the court held that the Controlled Substance Act allows for no medical necessity exception. And by parity of reasoning, as the court said in that case, you can't even consider that evidence because Congress has not allowed— Well, that's when we're interpreting a statute. Now we're talking about the Constitution. Well, even if one looks at the Compassionate Use Act in California, that act says nothing about limiting the marijuana at issue to California. It merely decriminalizes the possession and cultivation of marijuana by individuals and their personal caregivers. A person can grow it in California and transport it across state lines. They can have it grown for them in other states or Mexico, for that matter. There's nothing in the Compassionate Use Act that limits the activity in question to intrastate cultivation or possession. And I would also point out, Your Honor, that if a state initiative could cabin the class of activities regulated by Congress, then any number of other statutes might be called into question. This is far from the first dispute between the federal government and the states. Well, states are winning more these days. Well, they certainly have in some cases, Your Honor, but they have not in the case of the Controlled Substances Act or in other statutes where Congress has clearly defined the class of activity as all intrastate or interstate distribution, cultivation, or possession of marijuana. I'd also point out— There's no question that under the statute, Congress covered all intrastate and interstate. The question is, can they? And the question is, are some of the intrastate activities they cover, such as in McCoy? They covered intrastate, and McCoy says intrastate activities may be covered as long as they're commercial. And the question is, if the intrastate activity is not commercial or if it's limited to a noncommercial purpose, just as in McCoy it was a category that was defined by the court, not a facial invalidity but an invalidity as to a certain class defined by the court. Now, here the class that we're asked to define is a class of marijuana used solely for medical purposes under a caregiver or whatever they call it. And it doesn't have to be defined by a state statute or by city regulations. It is a recognized use from a practical standpoint. And that category, your opponents say, does not have any effect on interstate commerce. It's solely used, rightly or wrongly, for medical purposes to help a limited group. Why does that have an effect on interstate commerce? Two answers, Your Honor. First off, in the McCoy case, this court expressly distinguished the statute at issue there from the controlled substance. Well, it distinguished it and said, but we don't consider what effect Morrison may have on it. Well, that's true, Your Honor, but Morrison didn't. First off, this court has upheld the constitutionality of the Controlled Substances Act following the Supreme Court's decision in Lopez. And it was in that decision that the Supreme Court enunciated the four-factor test. The difference in Morrison, of course, was that in that case the Supreme Court said that courts don't blindly adhere to congressional findings. There has to be a rational basis or attenuation between the class of regulated activities and what the statute reaches. And this court, on numerous occasions, beginning in its very first decision in Rodriguez-Camacho. And then everyone talked about commercial use. Well, but even if we looked at, I would say again that if the Supreme Court held, as it did in Oakland Cannabis, that one cannot even consider the medical evidence with respect to medical necessity, it necessarily follows that one can't then consider that evidence for purposes of engaging in a Commerce Clause analysis. Again, it's the class of activities that's set forth by Congress, not by the states or an appellant. Well, where in McCoy, for instance, did Congress set forth the class that we considered? Do you find something in the statute that says that homegrown photography of your own people that are not intended ever to be used in commerce? No. That was a class. That's right. But Congress didn't define that class. The courts did. That's right. But this court noted that in footnote 24 of that opinion that the Controlled Substances Act was different from the statute at issue in McCoy because the Controlled Substances Act had legislative findings linking interstate possession and distribution and cultivation to interstate commerce. I would also point out, Your Honor, that if we take a look at Congress's findings, even considering the class of activities that the appellants propose, the analysis wouldn't change. In this case, they posit a class of noncommercial activities. And yet we have evidence in the record, which the district court credited, whereby each of the three appellant clubs distributed marijuana to underprivileged. How about the women's club? Is there any evidence with respect to that club? The only evidence is on the extras of records 8 and 9, which is a declaration from appellant Valerie Corral, where she says that while there's not a one-for-one transfer of funds for the marijuana, it does accept monies or people are encouraged to contribute to the women's alliance. And so it's not as close as we have with the other clubs, but there's still some economic activity ongoing. I take it it doesn't have to be for profit in order to be commercial within the meaning of the ---- I don't think it does have to be for profit to be considered economic or commercial. Well, it's obviously some money needed if you're going to provide a product to a group of women who get together, have a health problem. In order to get the product you're going to give them, there has to be some money involved. That may be the case. But so the fact that there's money doesn't make it commercial. Well, but it certainly makes it economic, and that's the ---- Is there anything that money's not involved in? Well, the ---- In this life? What the court looked at in Lopez and Morrison, the court found there wasn't money involved. The simple possession of a handgun in a school zone, the court found, did not involve any economic activity. I would note that ---- Well, there was economic activity in buying the gun. Well, but that wasn't the class of ---- The crime that was at issue there wasn't for possessing the gun. It was for possessing the gun in a school zone. Okay. I would also point out, Your Honor, that McCoy also focused on the fact that the photograph at issue in that case was not fungible. In this case, Congress has found that controlled substances that are cultivated or possessed intrastate cannot be differentiated from controlled substances possessed or cultivated intrastate, and that, therefore, it was necessary to control or regulate the entire area to affect interstate commerce. And I would point out that in the underlying Fifth Circuit decision in Lopez, the Fifth Circuit noted that distinction between the Drug-Free Schools Act and the Controlled Substances Act and noted that as compared to guns, drugs are a fungible item, and, therefore, its decision in Lopez wouldn't call into question even the simple possession statute under the Controlled Substances Act. But, you know, as far as your statements that Congress has determined this, it does ultimately come down to that whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress is ultimately a judicial rather than a legislative question. That's right, Your Honor. All right, so we have to decide, whatever Congress said, whether there's a sufficient relationship to interstate commerce in the use of this medical marijuana. Well, that's right, except my only disagreement, Your Honor, is that I don't think the relevant class of activities is the use of medicinal marijuana. What they say is whether particular operations. I assume the Court defines what particular operations are. I guess I'm not understanding Your Honor's question. I'm sorry. Well, the quote from originally Heart of Atlanta, but that's now in Morrison, is that whether particular operations affect interstate commerce sufficiently to come under the constitutional powers up to the courts to decide. That's true. So they say particular operations. And you say particular operations are decided by Congress? Well, because the Supreme Court and this court has held that Congress can declare that an entire class of activities affects interstate commerce. But that's the whole purpose of Morrison. It says that you can look at particular operations. You don't have to look just at what Congress has determined is a class. You look at whether particular operations fall within the commerce power that the courts must determine that. Well, I don't think Morrison under no, because the difference is that in Lopez itself the court reaffirmed that principle, that Congress can declare an entire class of activities affects interstate commerce, and courts cannot thereby excise trivial individual instances. Well, this is not trivial. I mean, you're right. Trivial if you say this person. But it's the class or the particular operation as opposed to a specific individual. Well, yes, except the class of activity Congress has held under the statute that all interstate and interstate cultivation, possession, and distribution affects interstate commerce. Now, this court has repeatedly held that the government need not show an individual nexus in every individual case to establish jurisdiction under the Commerce Clause. If this court were to hold that it could cabin the class of activities to the medicinal use, then there would be nothing that would not allow the appellant in Vismond, for example, to say the relevant class of activities is growing marijuana for my personal use in my backyard, to say nothing of medicinal use. Medicinal use doesn't add anything to the analysis. And the Supreme Court, as I said, in Oakland Cannabis, made clear that under the statute that evidence can't even be considered. Now, I would also point out, Your Honor, that it's not just the able district courts in this court or in these underlying cases that have so construed the Controlled Substances Act. Every other court that has been confronted with this question has held that the Controlled Substances Act, even in this area, falls within the lawful exercise of congressional authority under the Commerce Clause. And that includes Judge Jenkins in the Raich case and Judge Fogel in his recent position. He said if he were free to examine it, he would examine it. But he felt bound by our prior cases. And as I said when I began, I think that those judges quite correctly recognize that resolution of the legal issues in this case involve a straightforward application of this court's existing precedents. I'll just turn briefly to the Tenth Amendment argument because I know that that hasn't been discussed. But the conclusion that the Controlled Substances Act is a lawful exercise of Congress's Commerce Clause authority disposes of the Tenth Amendment argument. And the Supreme Court made clear in the Hodel versus Virginia surface mining case that the supremacy clause permits no other result. And this is not a case of federal commandeering. The United States is not requiring state legislatures to enact any laws or commandeering state officials. And I think the best example of that was noted by Judge Fogel in his recent County of Santa Cruz case. Following the execution of the search warrant in 2002 at the Woman's Alliance, the chief of police of San Jose removed his officers from a joint federal state task force. And the fact that he had every right to do so and the federal government had no right to compel him to reinstate those officers demonstrates that there's no federal commandeering in this case. I would also note just by way of passing, we pointed out in our briefs that even on their own terms, the appellant's Tenth Amendment analysis fails because the California courts have held that the Compassionate Use Act does not decriminalize the distribution of marijuana, which is the conduct at issue with respect to the three clubs. In its more recent decision in People v. Golombos, the California Court of Appeal also found that widespread cultivation that's not just for oneself or a personal caregiver also can be criminalized or remains criminal under state law. So the conduct at issue here is not simply unlawful for purposes of federal law. It also remains unlawful for purposes of state law. And the state of California has indeed prosecuted individuals for engaging in the very same conduct that is at issue here. Let me briefly turn to the fundamental rights argument. We submit that this court's decision in Carnahan disposes of that issue. In Carnahan, this court held that constitutional rights of privacy and personal liberty do not give anyone the right to obtain laetrile and, by extension, other unapproved drugs or substances free of the lawful exercise of the government's police power. This court cited the Tenth Circuit's decision in Rutherford making the same point and the California Supreme Court's decision in People v. Privaterra. And I would note, Your Honors, that following the passage of the Compassionate Use Act, the California Court of Appeal in People v. Bianco held that notwithstanding that act, it remains the case that there is no federal or state constitutional right to obtain marijuana or other unapproved substances. So it's not simply the case that there's no federal constitutional right. The passage of that initiative did not create a fundamental right for purposes of state law. And that follows. The mere decriminalization of an activity doesn't transform that activity into a fundamental right. If that were the case, then the people of California would not be able to obtain marijuana. I agree with that. But what is – you think there is no fundamental right for someone in pain to use medical or other substances that will ease the pain and make his life bearable? There's no fundamental right to that? Well, there isn't. And that's what this Court has held in Carnahan, because the individual in Carnahan was a terminally ill cancer patient who wanted to use Laetrile, which he believed would save his life. And in Rutherford, again, it was a class of terminally ill cancer patients. So in that case, the Court was confronted with a claim that the substance would not only or merely give palliative care, but actually could save the life of that individual. And this Court in Carnahan and the Tenth Circuit in Rutherford nonetheless held that there was no fundamental right at issue. In that case, didn't we say that Laetrile didn't actually accomplish that? I don't believe that the Court made that statement in Carnahan or Rutherford. I think what the Court said is that the – Even if Laetrile did provide that relief? I thought you said he just believed that it would provide relief, but not that it would. Well, by definition, a terminally ill cancer patient has no other treatments available. And the claim was that this was the only possible way to save that person's life. And what the Court said is if one has to go through the administrative processes under the FDCA, if one wants to have that drug rescheduled, or that Laetrile wasn't a controlled substance, but there is a proper forum for people to go through to change the congressional determination of marijuana's placement in Schedule I. Does that mean you're saying that there isn't any fundamental right to ease pain if you're in agony? There's no fundamental right, no individual liberty or interest in ending your pain? I apologize if I misspoke. I'm not saying that because I don't think that that's the relevant class. I think that that was actually the class that this Court enunciated. No, I was just on the first question. The first question was is there a fundamental right or a liberty interest in easing pain, using whatever product will help you ease pain? Do individuals have any constitutional liberty interest in that? I think that's a question that the Supreme Court has left open in the assisted suicide cases. But I think in those cases the Court made clear that you had to look at a much greater degree of specificity at the conducted issue because like that case, the claim there was that we were trying to relieve pain, and the Court said no, the relevant class was the right to a suicide and thereby the right to obtain the aid of a physician in attending that. And I would submit that the relevant class here is the right to use a particular drug for treatment, marijuana. It's not simply the right to alleviate pain. Is there an answer to that constitutional question of whether there's a right to use a particular drug that assists you to end your pain? The answer is that there is a right to treatment, but there is not a right to unapproved drugs to treat pain. And I think that this Court so held in Carnahan. And I would point out that I think Professor Ullman conceded that the scope of their fundamental rights analysis would extend not just to marijuana but to heroin or any other unapproved substance because we're simply talking about the right to ease pain. I guess you're saying that there may be a liberty interest, but it's overcome by the government's interest in seeing that the product is regulated. I was really only on the first question of whether there was an interest. I don't think you're saying there's no interest. I think you're saying that there is an interest, or if there's an interest, the government nevertheless has a right to regulate that use. I think that's right, Your Honor. Okay. And what is the compelling governmental interest in regulating the use of medical marijuana? Well, I would respectfully submit that the compelling interest test is not the appropriate standard because we don't agree that there is a fundamental right at issue, and therefore it's rational basis review that this Court must consider the statute. And I would point this Court to the Second Circuit's decision in the Kiffler case. Second Circuit noted that the availability of the reschedule process when the courts have appeals is the very antithesis of the irrational basis that was alleged in that case. It would be one thing if Congress by fiat simply placed a drug in Schedule I and forever banned it from being changed, but Congress here has allowed for an administrative process to reschedule drugs. An administrative hearing can be held. Any interested party can put on evidence, and that decision then can be reviewed by a court of appeals. So that, as I said, is the very antithesis of the irrationality that at least one of the appellants in this case has proffered. Your Honors, if I might just briefly address two other quick points. The appellants have raised, or the Oakland Cannabis Buyers Cooperative has raised, the issue of the immunity under 21 U.S.C. Section 885D. As Judge Breyer found below and as Judge Fogle has recently found in the County of Santa Cruz case, a local law that expressly authorizes that which the Controlled Substances Act prohibits is preempted under Section 903 of that act, and therefore there is no immunity under Section 885D. And finally, I'd point out that there is the claim that's made that Judge Breyer should have denied the permanent injunctions in this case and forced the government to go criminally. I don't believe that's a serious argument. The Supreme Court made clear in Oakland Cannabis that one can't choose between non-enforcement of the statute and enforcement, but just which of different means of enforcement the government may select. And counsel for the Oakland Cannabis Cooperative, at excerpts of record page 4386, made clear that she wasn't asking the court to have the government go criminally against them. So I would submit that that is not a serious argument that's being made. In addition, the Marine Alliance defendants expressly disavowed that argument and said that we are happy. We're not happy that the government took action against us, but choice between a criminal prosecution and a civil injunctive action will take the civil injunction action. And it cannot be an abuse of discretion for Judge Breyer, having taken those views into account, have determined that the means which the government selected in this case was an appropriate method for enforcing the Controlled Substances Act. This court has no other questions. We respectfully submit that the judgments of the district courts be affirmed. Thank you. Before I get involved in some of the other points that were raised by Mr. Quintleff and I want to read for the court the excerpt of the declaration of Valerie Corral that he has referred to in his statement, the relevant portion of which reads, WHAM is supported by voluntary contributions from patients and others, but the availability of medicinal marijuana for a patient is not dependent upon or related to their financial contributions. Donations of time or money by patients are completely voluntary, based upon a patient's own assessment of their ability. This clearly does not, this sort of acceptance of contributions, which every institution of some sort or another must get funds in order to survive, does not turn the WHAM parties into a commercial activity. Well, they also have a website where they sell various products to subsidize this. Isn't that true? Well, those activities are commercial, but the question is whether the activities that are at issue here for which they're being prosecuted, not being prosecuted for those activities. What about the Oakland scheme where you go to a place and there's a price list on the wall and a counter of merchandise and you exchange money there? That is a different case, Your Honor. That's my client's and that's a different case than the WHAM case. I think it's important. I'm going to answer the question, but I do think it's important for this Court to keep the WHAM parties separate in the way they've organized their distribution from the way the Oakland parties have, and I think the WHAM case is just clearly not commercial. The Oakland case is a closer question because there is money in some sense changing hands, and if the mere fact of money changing hands in return for substances makes something commercial, then arguably this could be on the economic side of the line, at which case then you'd have to apply the substantial effects test under Wickard and Morrison. But we argue that that alone is not enough. Here it is a cooperative in which the only people that are entitled to medical cannabis are members. The cooperative is the members. The allocation of the money is simply a way in which this group activity takes place. You say the same thing about a country club. I mean, only the members of the club can play golf, but you wouldn't say it's not commercial. You might say it's not commercial. I'd have to think about the country club example, but the question is whether it's possible. I mean, I belong to Costco. Only members can go to Costco, but it's commercial. Well, that clearly is commercial, Your Honor. I'll concede the Costco case. The country club case gets a little tricky. It does. But the whole problem with this case is drawing lines. When you know the extremes are out of bounds. That's the same thing with the definition of the classes. Let me ask you one thing. In the opening, I thought that you suggested that the Supreme Court in open cannabis had expressly accepted, expressly left open the constitutional question. Is there language to that effect? Because I don't see it. I don't have the opinion in front of me. But as I recall, Justice Thomas said that they were not considering any of the constitutional questions because they had not been considered by the court below, and they were only deciding the issue of medical necessity. We need not decide, however, whether necessity can ever be a defense when the federal statute does not expressly provide for it? No, that's still within the context of the medical necessity issue. At some point within my five years, I was very grateful to Justice Thomas for having written this provision, and so therefore I should memorize that sentence. But he did, in fact, when the Supreme Court could have summarily dismissed our constitutional arguments and chose not to because it hadn't been considered by the court below. On page 494, because the Court of Appeals did not address these claims, we declined to do so in the first instance. Great relief to me. I do want to, in addressing the state sovereignty or the police powers question and the Tenth Amendment question, I do want to call Your Honor's attention to the statement in New York v. United States which was omitted from the quotation that the government cited in its brief which says, if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress. So we do not claim that somehow state activities are supreme or somehow trump the proper exercise of government power, but whether the government is exercising proper power as applied to the class of conduct in this case is the question. And if they were exercising power over interstate commerce, that would be the end of the question. But because they've chosen to reach inside a state and address a class of activities that was wholly intrastate, that raises the question of whether they've now acted improperly under the necessary improper clause. And they're not allowed to do so under the supremacy clause or any other clause in the Constitution. And I now see my time as it ends. Thank you very much, Your Honors. Thank you, counsel. The case just argued is submitted for decision. The Court appreciates the quality of arguments on both sides. The Court stands adjourned.
judges: Schroeder, Reinhardt, Silverman